**BALLOW BRASTED O'BRIEN & RUSIN P.C., Plaintiff–Appellee,**

v.

**Gary LOGAN, Defendant–Appellant.**

**Docket No. 04–4925–CV.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 2005.

Decided Jan. 20, 2006.

Gary Logan, Las Vegas, NV (Andrew J. Harakas, Desmond T. Barry, Jr., Condon & Forsyth, New York, NY, of counsel), for Defendant–Appellant.

Richard T. Sullivan, Sullivan Oliverio & Gioia, Buffalo, NY, for Plaintiff–Appellee.

Before: MESKILL and CABRANES, Circuit Judges, and A.H. NEVAS[1], District Judge.

---

1. Honorable Alan H. Nevas, United States District Judge for the District of Connecticut, sitting by designation.

2. The district court rested its decision on numerous alternative grounds. One of these grounds was its conclusion that because the Agreement is a court order, it is not subject to Logan's rescission claim. Because we con-

MESKILL, Circuit Judge:

This appeal from the United States District Court for the Western District of New York concerns the enforceability of an attorney substitution agreement (Agreement). Defendant-appellant Gary Logan, Esq., seeks to rescind an agreement with Ballow Brasted O'Brien & Rusin, P.C. (BBOR), obligating Logan to pay BBOR 20% of the attorney's fees Logan recovered from his representation of Mr. Eric Roll, who formerly had been BBOR's client. Logan seeks rescission on the grounds that (1) BBOR fraudulently induced him to enter into the Agreement, and (2) the Agreement runs afoul of Disciplinary Rule 2–107(a)(2) of New York's Lawyer's Code of Professional Responsibility (DR 2–107) and Nevada Supreme Court Rule 155(5). We hold that, due to Logan's four-year delay in challenging the contract, he has waived his right to assert rescission. We also hold that because BBOR unquestionably contributed to Roll's case and nothing in the record suggests that BBOR refused to contribute more substantially to Roll's legal services, the Agreement is enforceable pursuant to New York contract law. Although the district court's decision relied on alternative reasoning,[2] we nevertheless affirm the district court's order compelling Logan to pay $168,000 plus interest as calculated under 28 U.S.C. § 1961(a).

## I.

On November 16, 1994, Mr. Eric Roll (Roll) sustained injuries while serving in

clude that Logan's delay precludes him from asserting rescission of the Agreement and that the Agreement is enforceable as a matter of New York contract law, we do not reach the question of whether a contract becomes insulated from common law contract defenses when entered as an order of the court.

the Air Force at Nellis Air Force Base in Nevada. He retained the Plaintiff, BBOR, a law firm in Buffalo, New York, to represent him in his personal injury action. BBOR filed a complaint on Roll's behalf in the United States District Court for the Western District of New York on November 6, 1996. On March 3, 1998, Roll informed BBOR that he wanted the defendant, Gary Logan (Logan), an attorney in Las Vegas, Nevada, to replace BBOR as his counsel.

When Roll informed John Ballow, a partner at BBOR, that he wanted Logan to assume his representation, Ballow and Logan negotiated terms that were memorialized in the Agreement. The Agreement substituted Logan for BBOR as Roll's counsel and provided that Logan would pay BBOR 20% of the gross legal fees obtained "in the event [Roll] recovers monetary damages in this action, whether by settlement or judgment." The Agreement also noted that BBOR had already spent $23,000 for expenses and disbursements litigating Roll's case, but provided that these expenditures would be "included in the 20% paid from the gross attorney's fees." Finally, the Agreement provided that BBOR would immediately transfer Roll's file to Logan's office. All parties involved signed the Agreement and submitted it to the presiding judge, Judge Curtin, who "so-ordered" the Agreement and entered it as an order of the court on April 4, 1998.

After assuming representation of Roll, Logan filed a motion to transfer the case to the United States District Court for the District of Nevada. The transfer motion was granted and the case was tried in February 2002. The jury deadlocked. The case thereafter was settled for $2,100,000 in July 2002. Logan received attorney's fees in the amount of $840,000.

When BBOR demanded 20% of the $840,000 in accordance with the Agreement, Logan refused to make the payment and BBOR commenced this suit in the United States District Court for the Western District of New York. Logan answered and asserted various affirmative defenses, including two relating to the enforceability *vel non* of the Agreement.

First, Logan claimed that the Agreement was induced by fraudulent misrepresentations. Specifically, Logan contended that, contrary to BBOR's assertions, BBOR had not (1) conducted extensive discovery, (2) retained an expert, (3) conferred with the expert to formulate a viable defense to the opposition's then-pending motion for summary judgment, or (4) incurred approximately $23,000 in expenses.

Second, Logan argued that the Agreement violated DR 2-107, which provides that

[a] lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of the lawyer's law firm, unless ... [t]he division is in proportion to the services performed by each lawyer or, by a writing given to the client, each lawyer assumes joint responsibility for the representation.

22 N.Y.C.R.R. § 1200.12(a)(2) (McKinney 2005).[3]

---

**3.** In his Answer and again on appeal, Logan also maintains that the Agreement violates Nevada Supreme Court Rule 155(5), which provides that

[a] division of fee between lawyers who are not in the same firm may be made only if: (a) The division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; (b) The client is advised in writing of and does not object to the participation of all the lawyers involved; and (c) The total fee is reasonable.

Based on his claim that BBOR materially had misrepresented the extent of its contribution to Roll's case and the disciplinary rule violation, Logan refused to pay BBOR pursuant to the attorney substitution agreement.

At the conclusion of discovery, BBOR moved for summary judgment. In opposition, Logan argued that there existed a dispute as to whether BBOR had made material misrepresentations that induced Logan to sign the Agreement. The district court denied BBOR's motion, holding that BBOR had violated United States District Court for the Western District of New York Local Rule of Civil Procedure (Local Rule) 7.1(e) (requiring the filing of a memorandum of law with a motion for summary judgment), both parties had violated Local Rule 56.1(d) (mandating the specification of particular admissible evidence following each material fact), and BBOR "failed to demonstrate that it 'is entitled to a judgment as a matter of law' within the meaning of Rule 56(c) of the Federal Rules of Civil Procedure." It is unclear, however, whether the final ground for denial was based on substantive or procedural grounds.

BBOR then filed a motion for reconsideration of the court's order. In an order signed on August 10, 2004, the court reconsidered its prior order and granted plaintiff's motion for summary judgment. This order declared that the stipulation substituting counsel was a court order, not a contract, and therefore was not subject to Logan's asserted contract defense. Alternatively, even if the stipulation had been deemed a contract, the court rejected Logan's fraudulent inducement claim. The court also found that DR 2–107 was inapplicable because the Agreement concerned

an attorney substitution, not a fee-sharing agreement governing joint representation by multiple attorneys. As a result of these findings, the court granted BBOR's motion for reconsideration and ordered Logan to pay $168,000 plus interest as calculated according to 28 U.S.C. § 1961(a). Because we agree that Logan is required to pay BBOR the amount memorialized in the Agreement, albeit for different reasons than those given by the district court, we affirm.

## II.

After granting BBOR's motion for reconsideration, the district court granted BBOR's motion for summary judgment, concluding that there were no genuine issues of material fact, and that BBOR was entitled to judgment as a matter of law. We review a district court's granting of summary judgment *de novo*. *Rubens v. Mason*, 387 F.3d 183, 188 (2d Cir.2004).

## A.

Logan contends that he is not required to fulfill his obligation under the Agreement because BBOR fraudulently induced him to enter into the Agreement. The law is clear that a party induced to enter a contract by fraud or misrepresentations must make a choice; the party may either "elect to accept the situation created by the fraud and seek to recover his damages or he may elect to repudiate the transaction and seek to be placed in status quo. As a general rule, however, the defrauded party cannot both rescind and maintain an action for deceit." 27 Richard A. Lord, *Williston on Contracts* § 69:47, at 102 (4th ed.2003) (quoting *Ringsby Truck Lines v. Beardsley*, 331 F.2d 14, 17 (8th Cir.1964));

Nevada Sup.Ct. R. 155(5) (Michie 2005). Because the relevant portion of this rule is effectively identical to DR 2–107—and our reasoning is the same regardless of which is applicable—we apply the New York rule and dispense with any choice of law analysis.

see also Ferguson v. Lion Holding, *312 F.Supp.2d 484, 498 (S.D.N.Y.2004). Logan chose the second option, rescission, as manifested both by his actions (i.e., refusal to remit any money to BBOR) and his words (i.e., his fifth affirmative defense).*

■ Where a party opts for rescission due to misrepresentation or fraud

> [i]t is well settled by repeated decisions of [the Supreme] [C]ourt that … he must upon the discovery of the fraud announce his purpose and adhere to it. If he continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract.

*Shappirio v. Goldberg,* 192 U.S. 232, 242, 24 S.Ct. 259, 48 L.Ed. 419 (1904); *see also Allen v. WestPoint–Pepperell,* 945 F.2d 40, 47 (2d Cir.1991) ("An action for rescission must be initiated without unreasonable delay."); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1211 (S.D.N.Y.1994) ("Rescission claims must be instituted promptly after discovery of the fraud." (internal quotation marks omitted)); *Schenck v. State Line Telephone Co.,* 238 N.Y. 308, 313, 144 N.E. 592 (1924) ("[W]e do not deny that rescission to be effective must be announced without unreasonable delay." (citation omitted)); *cf. Stambovsky v. Ackley,* 169 A.D.2d 254, 258, 572 N.Y.S.2d 672, 676 (1st Dep't 1991) ("The

doctrine of caveat emptor requires that a buyer act prudently to assess the fitness and value of his purchase and operates to bar the purchaser who fails to exercise due care from seeking the equitable remedy of rescission." (citation omitted)). The record indicates that Logan was likely aware of the material misrepresentations "in the months following" March 1998.[4] Logan did not, however, apprise BBOR that those misrepresentations, in his view, rendered the contract voidable until August 1, 2003, at least four years later when Logan filed his Answer. His claim for rescission, therefore, was manifestly untimely and, under the case law, cannot prevail.

Although the timely notification obligation is a "fairly stringent requirement," *Banque Arabe,* 850 F.Supp. at 1211 (citing *Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969)), one court in this Circuit has recognized an exception to this obligation. *Allen v. West Point–Pepperell,* 908 F.Supp. 1209, 1218–20 (S.D.N.Y.1995). According to *Allen,* "a party seeking to rescind a contract need not demonstrate promptness if he or she does not possess property that must be returned in the event of rescission." *Id.* at 1219. Logan argues that the consideration he received pursuant to the Agreement—becoming Roll's attorney of record and benefiting from BBOR's prior legal work—was not readily returnable. Thus, *Allen*'s excep-

---

4. In Logan's sworn affidavit in opposition to plaintiff's motion for summary judgment he stated that he "did not learn until long after April 2, 1998 that [BBOR] had made material misrepresentations of fact to [him] which induced [him] to enter into the Stipulation." However, his affidavit also includes the statement that "[h]ad [he] known in March, 1998, what [he] learned *in the months following [BBOR's] termination* as counsel of record for Eric Roll, [he] would have advised Mr. Roll to terminate [BBOR] as his counsel of record for gross misconduct and incompetence and to reject any claims for compensation for ser-

vices rendered made by [BBOR]." If Logan was able to conclude, "in the months following" March 1998, that BBOR was grossly incompetent, then it follows that he was likewise familiar enough with Roll's file to be able to conclude that BBOR had misrepresented the extent of its legal work. Construing the statement—"in the months following" the end of March 1998—very generously, we will assume that it represents twelve months. Thus, he should have been aware of BBOR's misrepresentations at least by the end of March 1999.

tion applies and forgives his four-year delay. Although we agree that the consideration received could not be returned, Logan cannot rely on *Allen*'s exception to excuse his four-year delay because that exception is inconsistent with the case-by-case analysis employed by controlling circuit precedent. *See, e.g., Adams–Mitchell Co. v. Cambridge Distrib. Co.*, 189 F.2d 913, 917 (2d Cir.1951) (holding that when a court sitting in equity considers the effect of a party's dilatory behavior. in the context of a rescission claim "[e]ach case must stand on its own facts").

Case law from this Court has categorically stated that "[a]n action for rescission must be initiated without unreasonable delay." *Allen*, 945 F.2d at 47 (citing *Schenck*, 238 N.Y. at 313, 144 N.E. 592). The concept that a party's delayed notification must be "reasonable," suggests a malleable standard that comports with the overall equitable nature of this remedy. *See* 13 Am.Jur.2d, *Cancellation of Instruments* § 2 (2005) ("Judicial ... rescission of an instrument is an equitable remedy, in which the principles of equity govern or apply.") (footnote omitted). *Allen*'s exception, a *per se* rule that failure to notify is acceptable when there is no property to return, is antithetical to the case-by-case analysis undertaken in evaluating rescission claims, *see Adams–Mitchell Co.*, 189 F.2d at 917; *cf. Gannett Co. v. Register Publ'g Co.*, 428 F.Supp. 818, 836 (D.Conn. 1977)· (explaining that while "the passage of time [does not] preclude rescission regardless of the circumstances[,] ·... under the circumstances of this particular case rescission is unavailable"). For this reason, we reject *Allen*'s *per se* exception that notification of rescission need not be provided promptly in cases where the property received by the allegedly aggrieved party cannot be returned. Rather, we will consider the facts of this case to determine whether Logan's delay was reasonable.

■ In this case, Logan waited at least four years to assert his rescission claim. Logan conceded at oral argument that during his delay BBOR would have no reason to believe that Logan planned to refuse to pay, even though, all along, Logan harbored an intention not to live up to his end of the bargain. Logan's sole explanation for his failure to apprise BBOR of his rescission claim was that his obligation under the Agreement did not ripen until the Roll action was resolved. This explanation is insufficient because Logan knew for four years that he would contest his obligation under the Agreement if and when he received payment—and nothing prevented him from informing BBOR. Equity does not favor affording Logan relief after he deliberately allowed BBOR to maintain its unrealistic expectation that Logan would adhere to the Agreement. *See Grymes v. Sanders*, 93 U.S. 55, 62, 23 L.Ed. 798 (1876) ("A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo*. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it."). The equities are further stacked against Logan because his explanation for failing to notify BBOR evinces his impermissible "wait and see" approach to the prosecution of his rights: if the Roll litigation was successful and there was money at stake, he would resurrect his stale claim. *See McLean v. Clapp*, 141 U.S. 429, 432, 12 S.Ct. 29, 35 L.Ed. 804 (1891) (holding that a litigant is " 'not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted.' " (quoting *Grymes*, 93 U.S. at 62)); *Gannett*, 428 F.Supp. at 825 ("A party has a right to rescind a contract, where he was induced to enter into it by fraud; but he must do so promptly upon

the discovery of the fraud, and cannot speculate as to whether it would be more profitable to affirm the contract or rescind it." (quoting *Sarantides v. Williams, Belmont & Co.,* 180 N.Y.S. 741, 743 (N.Y.App. Term 1st Dep't 1920)). Given the facts of this case, Logan's four-year delay was patently unreasonable.

### B.

■ Logan argues, in the alternative, that 20% of his fee is not proportional to BBOR's legal services; thus the Agreement runs afoul of DR 2–107.[5] The district court rejected this argument, noting that the "arrangement" in this case was not a fee-sharing agreement, but rather an agreement concerning the substitution of counsel. We disagree with the district court's conclusion that DR 2–107 is inapplicable to this Agreement. We conclude, however, that the Agreement is valid and enforceable as a matter of New York contract law.

■ It is axiomatic that a client may discharge his attorney with or without cause. *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.,* 370 F.3d 259, 263 (2d Cir.2004). When an attorney is discharged without cause and asserts a claim for fees against successor counsel, he may recover either the fair and reasonable value of his services in *quantum meruit* or his proportionate share of the work performed on the entire case. *Cohen v. Grainger, Tesoriero & Bell,* 81 N.Y.2d 655, 658, 602 N.Y.S.2d 788, 789–90, 622 N.E.2d 288 (1993). Assuming that a discharged attorney elects the latter option, we see no reason why an agreement between the discharged attorney and the client's new attorney, regarding the allocation of fees, would not be subject to the

proscriptions of DR 2–107. Furthermore, we deem *Ford v. Albany Medical Center,* 283 A.D.2d 843, 845–46, 724 N.Y.S.2d 795, 797–98 (3d Dep't 2001), to be consistent with this conclusion.

In *Ford,* an individual sought representation from an attorney for a possible medical malpractice action. *Id.* at 843–44, 724 N.Y.S.2d 795. Two months later the attorney received a letter from a second attorney explaining that the individual wanted to substitute attorneys. *Id.* at 844, 724 N.Y.S.2d 795. The two attorneys reached an agreement concerning the splitting of counsel fees, and the initial attorney then signed a consent to change attorney form. *Id.* The two attorneys agreed that the initial attorney would receive 33.33% of any attorney's fees obtained by the second attorney. *Id.* At the conclusion of the malpractice action, the second attorney was paid $99,701.48, but he refused to make any payment to the initial attorney. *Id.* The court, upholding the second attorney's right to withhold payment, held, in light of DR 2–107, that "[the initial attorney's] claim for 33.33% of the counsel fee to be paid in this action based solely upon his purported agreement with [subsequent counsel] cannot be upheld." *Id.* at 846, 724 N.Y.S.2d 795.

The only distinguishing characteristics of the current case are the length of time that BBOR was retained and the fact that BBOR had initiated the lawsuit. These facts, however, do not render *Ford* inapposite. Rather, the amount and type of work completed by the discharged attorney simply affect whether the former attorney's recovery is proportional to the work he performed, *i.e.,* the reasonableness of the former attorney's fee. *Ford* stands for the

---

**5.** DR 2–107(A)(2) prohibits the division of fees among lawyers who are not in the same firm unless "[t]he division is in proportion to the services performed by each lawyer or, by a writing given the client, each lawyer assumes joint responsibility for the representation."

proposition that fixing the percentage to be paid to the discharged attorney at the time of substitution is likely to run afoul of DR 2–107 because that amount may not be "in proportion to the services performed by each lawyer." *Id.; see also Cohen*, 81 N.Y.2d at 659, 602 N.Y.S.2d at 790, 622 N.E.2d 288 ("[T]he calculation of a contingent percentage fee is better left to the conclusion of the litigation 'when the amount of the recovery and the relative contributions of the lawyers to it can be ascertained.' ") (quoting *Lai Ling Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 459, 541 N.Y.S.2d 742, 745, 539 N.E.2d 570 (1989)).[6]

According to these cases, BBOR could have either requested, in *quantum meruit*, the fair and reasonable amount of the services rendered, to be paid at the time of the substitution, or a contingent portion of Roll's ultimate recovery, which is more properly determined at the conclusion of the litigation. BBOR chose neither of these options. Rather, BBOR attempted to claim a definite percentage of the potential recovery at the time of substitution. Fixing the percentage paid to each attorney at the time of substitution is likely to run afoul of DR 2–107 because the prede-

termined relative percentages may not be representative of the amount of work rendered by each attorney. While we cannot say with certainty that the 80/20 split in this case was disproportionate to the services rendered by Logan and BBOR, it is more likely than not, after further inquiry into the attorneys' records, that a different apportionment would be more representative. Nevertheless, the possible violation of DR 2–107 in this case does not compel the conclusion that we should refuse to enforce the Agreement as a matter of New York contract law.

While *Ford* did refuse to enforce a fee-sharing agreement that violated DR 2–107, a related line of New York cases has enunciated the principle that "[i]t has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either refused to contribute more substantially." *Benjamin v. Koeppel*, 85 N.Y.2d 549, 556, 626 N.Y.S.2d 982, 985, 650 N.E.2d 829 (1995) (internal quotation marks omitted)[7];

6. We note that BBOR cites to *Lai Ling Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 541 N.Y.S.2d 742, 539 N.E.2d 570 (1989), for the proposition that substitution agreements are dissimilar to fee-sharing agreements, and the former agreements are not within the ambit of DR 2–107's provisions. We do not read *Cheng* to support this position. While *Cheng* does concede that the terminated attorney's percentage fee *"may* be fixed at the time of substitution," *id.* at 458, 541 N.Y.S.2d 742, 539 N.E.2d 570 (emphasis added), it later observes that "a contingent percentage fee is properly determined at the end of litigation when the amount of the recovery and the relative contributions of the lawyers to it can be ascertained," *id.* at 459, 541 N.Y.S.2d 742, 539 N.E.2d 570 (citation omitted). Thus, *Cheng* is consistent with *Ford* 's analysis of the proper time to determine the relative fees to

be paid to each attorney, and; moreover, *Cheng* takes no position regarding the applicability of DR 2–107 to attorney substitution agreements.

7. To the extent *Ford* and *Benjamin* can be read to conflict, we follow the decision of the Court of Appeals in *Benjamin*. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9, 17 n. 11 (D.Mass.2001) (noting that *Ford* reached a "contrary result" to *Benjamin* and that it "failed to cite *Benjamin* or any more recent authority"). On a question of New York law, we are not bound by a decision of the Appellate Division if we have persuasive evidence that the New York Court of Appeals "would reach a different conclusion." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 n. 5 (2d Cir.2004).

accord *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir.1999) ("Under New York law, it is well established that an agreement *between attorneys* for division of a legal fee is valid and is enforceable in accordance with terms set forth in agreement, provided that each party actually contributed some work, labor and service toward earning of the fee and there is no claim that either refused to contribute more substantially.") (internal quotation marks omitted); *Oberman v. Reilly*, 66 A.D.2d 686, 687, 411 N.Y.S.2d 23, 25 (1st Dep't 1978) ("[A]n agreement between attorneys for division of a legal fee is valid and is enforceable in accordance with the terms set forth in the agreement, provided that the attorney who seeks his share of the fee contributed some work, labor or service toward the earning of the fee."); *see also Cheng*, 73 N.Y.2d at 458, 541 N.Y.S.2d at 744, 539 N.E.2d 570 (The percentage of a total fee to which a substituted attorney is entitled "may be fixed at the time of substitution" even though it is "better determined at the conclusion of the case when such factors as the amount of time spent by each lawyer on the case, the work performed and the amount of recovery can be ascertained."). There is no dispute here that BBOR, having filed suit on Roll's behalf, "actually contributed to the legal work." *Benjamin*, 85 N.Y.2d at 556, 626 N.Y.S.2d at 985, 650 N.E.2d 829. Moreover, nothing in the record suggests that BBOR "refused to contribute more substantially" to Roll's legal services. *Id.*[8] (internal quotation marks omitted). The agreement was therefore enforceable under New York law.

We also note our agreement with *Benjamin*'s recognition that "it ill becomes [the parties seeking to avoid paying the fee],

who are also bound by the Code of Professional Responsibility, to seek to avoid on 'ethical' grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits." *Id.* (citing ABA Comm. on Prof'l Ethics, Informal Op. 870 (1965)). This principle is directly on point in this case. Logan is bound by the same rules of professional responsibility that he now seeks to use as a sword to avoid his obligations under an Agreement to which he freely consented. Logan's inequitable conduct is yet another reason why we will enforce the Agreement.

## III.

Claims for rescission based on alleged fraudulent misrepresentations must be asserted in a timely manner. Having waited approximately four years to assert this very claim, Logan has failed to meet this requirement and the equities do not favor permitting the claim to proceed. As a result, he cannot be absolved from his obligations under the Agreement with BBOR, which is enforceable pursuant to New York contract law. Therefore, albeit on different grounds, the ruling of the district court granting summary judgment in favor of BBOR is affirmed.

---

**8.** To the extent Logan's fraud argument could be construed as a contention that BBOR "refused" to provide the services it purported to provide, we held above that Logan is precluded from asserting it.